| | |
|---|---|
| ERVIN EQUIPMENT INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 4:15-CV-104-PPS-PRC |
| | ) |
| WABASH NATIONAL CORP., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This case is about the attempted termination of a dealership agreement between a manufacturer of semitrailers, Wabash National Corporation, and Ervin Equipment, Inc., one of Wabash's dealers. The parties entered into a Dealership Agreement in June 2011 giving Ervin the right to buy for resale a specific type of Wabash semitrailers and prohibiting Ervin from selling any competing products without the written consent of Wabash. Ervin's territory — their "Area of Responsibility" in the parlance of the Dealership Agreement — included a number of counties in Texas as well as all of Mexico. Despite several years of what Ervin describes as a relatively fruitful relationship, Wabash notified Ervin on July 1, 2015 that, pursuant to the termination provisions in the Dealership Agreement, it would be terminating the Agreement on December 31, 2015. Ervin believes that Wabash's termination of the Dealership Agreement is without good cause and sufficient notice and, therefore, a violation of Indiana law.

Ervin filed this action invoking the diversity jurisdiction of the Court. It alleges violations of the Indiana unfair practices statute under Title 9 of the Indiana Code governing motor vehicles and the Indiana Franchise Act (Title 23) and breach of the Dealership Agreement. Ervin requests monetary damages and both a preliminary injunction enjoining Wabash from terminating the Dealership Agreement while this action is pending and a permanent injunction enjoining Wabash from terminating the Dealership Agreement without good cause. The day after Ervin moved for a preliminary injunction, Wabash filed a motion to dismiss the amended complaint for failure to state a claim. For the following reasons, Ervin's motion for preliminary injunction will be denied and Wabash's motion to dismiss will be granted in part and denied in part.

## Background

In considering the motion to dismiss, the facts come from the amended complaint which I accept as true for present purposes. Ervin sells and distributes semitrailers throughout the United States and Mexico. [DE 16 at ¶7.] Wabash manufactures semitrailers including "dry vans" and "refrigerated vans," conducting business across the United States and Mexico. [*Id.* at ¶8.] In June 2011, Ervin entered into a Dealership Agreement with Wabash that gave Ervin the right to buy new Wabash dry vans and refrigerated vans for resale and to use Wabash's names and marks in doing so. [*Id.* at ¶9.] The Dealership Agreement appointed Ervin as a Wabash dealer in a specific area of responsibility ("AOR") that included designated counties in southern

Texas and the entire country of Mexico. [*Id.* at ¶10.] The Dealership Agreement prohibited Ervin from selling any products that competed with those of Wabash without Wabash's prior written consent and Ervin claims that it gave up its right to sell a Hyundai line of trailers as a result of this provision. [DE 1-1 at ¶2; DE 16 at ¶12.] Ervin has not sold any competing line of trailers in the AOR or elsewhere since 2011. [*Id.* at ¶13.]

The Dealership Agreement is poorly drafted. It is ambiguous over whether Ervin was permitted to sell Wabash products outside of its AOR. To be sure, the Agreement does not explicitly say that Ervin cannot sell outside of its AOR. On the other hand, one might reasonably ask what would be the purpose of an AOR unless it restricted the dealer from operating outside of it. Indeed, the Agreement specifically says that Ervin "is hereby appointed a Wabash National dealer of specified Wabash National products in the area of responsibility." [DE 1-1 at 1.] The area of responsibility (parts of Texas and all of Mexico) is set forth in Exhibit B of the Agreement. The Agreement doesn't say that Ervin has carte blanche to sell anywhere it wants. So we are left with an agreement that specifically provides Ervin a territory but doesn't say one way or the other whether Ervin is limited to operating within that territory.

The initial term of the Dealership Agreement ran from July 1, 2011 to December 31, 2012. [DE 1-1 at 8.] The Dealership Agreement provided that:

The term shall be renewable annually thereafter by written agreement of the

3

parties. In the event no written agreement of renewal is signed by the parties, this Agreement shall remain in effect on a month to month basis until this Agreement is terminated pursuant to the termination provisions herein, whichever first occurs. No cause shall be necessary for such non-renewal.

[*Id.*] Paragraph 19 of the Dealership Agreement describes the parties' rights to terminate. It states:

Unless otherwise provided by applicable law, and unless otherwise provided in this Agreement, this Agreement may be terminated upon thirty (30) days written notice by Dealer or Wabash National.

[*Id.* at ¶19.] In addition, it lists 12 circumstances in which Wabash may immediately terminate the Dealership Agreement upon written notice to Ervin, including failure by Ervin to pay any sums due to Wabash within ten days after demand, failure by Ervin for a period of fifteen days after written notice to perform any obligation under the Dealership Agreement, and Ervin's failure to perform as defined in certain enumerated paragraphs of the Dealership Agreement, including the paragraph that set out Ervin's AOR. [*Id.*]

Ervin alleges that it fully performed its obligations under the Dealership Agreement. [*Id.* at ¶20.] Ervin has physical locations in Illinois, Indiana, and Texas at which it either stores or sells Wabash products. [*Id.* at ¶21.] It alleges that between June 2011 and June 30, 2015 it sold a total of 6,291 Wabash trailers, 2,813 (44.71%) of which were sold in the AOR and 3,478 (55.3%) of which were sold to customers outside of the AOR. [*Id.* at ¶22.] Many of the trailers sold outside of the AOR were sold directly to other Wabash dealers. [*Id.* at ¶23.] Upon information and belief, Ervin claims that

Wabash eventually received complaints from other Wabash dealers regarding Ervin's sale of Wabash products in those dealers' AORs. Ervin claims that Wabash never told Ervin that it could not sell Wabash trailers to customers outside of its AOR and that Wabash knew that Ervin was doing so and even approved Ervin's requests on several occasions to quote customers outside its AOR on custom-built orders. [*Id.* at ¶29.] Ervin further alleges that Wabash only occasionally asked Ervin not to make a specific sale because another dealer was complaining about it. [*Id.*]

On July 1, 2015, Wabash's Director of Van Sales, Todd Chrzan, sent a letter to Ervin's President, Greg Ervin, announcing Wabash's intention to terminate the Dealership Agreement. The letter is not a model of clarity. It states that Chrzan was following up with Ervin about their recent call to discuss "Ervin's coverage of its territory as a dealer for the Wabash National brand and the timeliness of paying invoices," noting that per the "2011 Dealer Agreement in Exhibit A, our dealership relationship is currently month-to-month . . . [and] Ervin or Wabash National may terminate our Dealership Agreement upon thirty (30) days written notice." [DE 16-2.] The letter went on to state that it "is written notice that our Dealer Agreement shall terminate on December 31, 2015 " and that "[u]pon such termination on December 31, Dealer shall make final payment for all outstanding orders . . . [and] must return all Confidential Information, signs, sales aids or any other property belonging to Wabash National." [*Id.*] Finally, the letter stated that "[i]f Ervin agrees to pick up all trailers ordered by Ervin in 2015 by December 31, 2015, Wabash National agrees to sell and

5

build up to 450 trailers for Ervin in 2016." [*Id.*]  Ervin asserts that it immediately

responded to the termination letter both verbally and in writing by text and email to

indicate its protest to Wabash terminating the Dealership Agreement.  [DE 16 at ¶33.]

Instead of acting with dispatch, Ervin did precisely nothing for five months — at

least not formally.  Finally, in late November, with the December 31st termination

deadline looming, Ervin filed this action.  In it, Ervin claims that Wabash violated the

Indiana unfair practices statute and the Indiana Franchise Act by terminating the

Dealership Agreement because it did not have good cause to terminate or fail to renew

it and that the termination or nonrenewal of the Dealership Agreement was a breach of

the Dealership Agreement.  [*Id.* at ¶¶34-65.]  Ervin seeks a preliminary injunction

enjoining Wabash's termination or nonrenewal of the Dealership Agreement while this

action is pending and also seeks damages as a result of Wabash's alleged breach of

contract and violations of Indiana law.  [*Id.* at 10.]  A hearing on the motion for

preliminary injunction was held.  [DE 35.]  In addition to responding to the request for a

preliminary injunction, Wabash has moved to dismiss the amended complaint pursuant

to Federal Rule of Civil Procedure 12(b)(6).  [DE 20.]  Because the two motions are

obviously related, I will address them together in this opinion.

## Discussion

### The Motion to Dismiss

Wabash has moved to dismiss the amended complaint under Federal Rule of

Civil Procedure 12(b)(6).  To survive such a motion, "a complaint must contain

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (internal quotation marks and citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I must accept as true all factual allegations in the amended complaint and draw all reasonable inferences in favor of the plaintiff, but I am not required to accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 663.

The amended complaint contains three counts. Count I alleges that Wabash is violating the Indiana unfair practices statute pursuant to Ind. Code §§ 9-32-13-8 and 9-32-13-27 by terminating the Dealership Agreement without good cause and without providing notice of the termination with the detail required under the unfair practices statute. Count II alleges that Wabash is violating Ind. Code § 23-2-2.27-1(8) of the Indiana Franchise Act by terminating or failing to renew the Dealership Agreement without good cause. Count III alleges that Wabash's termination or non-renewal of the Dealership Agreement without good cause is a breach of contract because the provisions of the Dealership Agreement allowing Wabash to terminate without good cause are in violation of the Indiana Franchise Act and, are therefore, unlawful and unenforceable. I will address these allegations in turn.

"As with any question of statutory interpretation, our analysis begins with the plain language of the statute. It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman* , 555 U.S. 113, 118 (2009) (citations omitted). When considering an Indiana law, "we must interpret

the statute as we think the Indiana Supreme Court would interpret it. In Indiana, the lodestar of statutory interpretation is legislative intent, and the plain language of the statute is the best evidence of that intent. "Unless a statute indicates otherwise, we must give the words in the statute their plain and ordinary meaning, and we must examine the statute as a whole, avoiding both excessive reliance on strict literal meaning and selective reading of individual words." *United States v. Mohamed*, 759 F.3d 798, 804 (7th Cir. 2014) (citation omitted) (internal quotation marks omitted).

I will begin with Ervin's claims under the Indiana unfair practices statute. Ind. Code § 9-32-13-27 regarding unfair practices provides in relevant part:

> (a) It is an unfair practice for a manufacturer or distributor to do the following:
>
> (1) Cancel or terminate a franchise or selling agreement of a franchisee, or fail or refuse to extend or renew a franchise or selling agreement upon the franchise's or selling agreement's expiration, without good cause or notice to the franchisee by certified mail, return receipt requested.
>
> (A) at least ninety (90) days before the cancellation or termination.

Ind. Code § 9-32-13-27(a) also requires that "[n]otice provided under this subsection must include a detailed statement setting forth the specific grounds for the proposed action."

Analysis of the unfair practices claim requires me to unpack a nesting doll of statutory definitions. The first issue I must address before getting to the meat of the statute is whether Wabash is a "manufacturer" as defined by the statute. Based on the plain language of the statute, it is. Ind. Code § 9-13-2-97(b) defines "manufacturer" for

purposes of Ind. Code § 9-32 as "a person who is engaged in the business of manufacturing or assembling new motor vehicles or major component parts of motor vehicles, or both, and sells new motor vehicles to dealers, wholesale dealers, distributors, or the general public."  Ind. Code § 9-13-2-97 states that "motor vehicle" for purposes of Ind. Code  § 9-32-13 includes a "semitrailer."  Ind. Code § 9-13-2-164 defines "semitrailer" as "a vehicle without motive power, designed for carrying property and for being drawn by a motor vehicle, and so constructed that some part of the weight of the semitrailer and that of the semitrailer's load rests upon or is carried by another vehicle."  Ind. Code § 9-13-2-196 defines "vehicle" as "a device in, upon, or by which a person or property is, or may be, transported or drawn upon a highway." Reading these definitions together, semitrailers manufactured by Wabash, described as "dry vans" and "refrigerated vans," fall within the definition of "motor vehicle" for purposes of Ind. Code § 9-13-2-97, making Wabash a "manufacturer" pursuant to the unfair practices statute.

The next issue is whether the Dealership Agreement granted a "franchise" to Ervin under the unfair practices statute, making Ervin a "franchisee."  *See* Ind. Code § 9-32-13-27.  Ind. Code § 9-32-2-14 defines franchisee as "a dealer to whom a franchise is granted."  Ind. Code § 9-32-2-13 defines "franchise" as "an oral or a written agreement for a definite or an indefinite period in which a manufacturer or distributor grants to a dealer a right to use a trade name, trade or service mark, or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or related

services at retail or otherwise." A "dealer" is defined in Ind. Code § 9-13-2-42 as "a person who sells to the general public . . . at least twelve (12) vehicles each year." As I have previously discussed, Wabash's semitrailers fall within the definition of "vehicle" for purposes the statute thus making Ervin a "dealer."

Having established the Ervin is a dealer, the next step is to determine, whether, under the definition of "franchise," there is a "community of interest" in the marketing of Wabash semitrailers. The term "community of interest" is not defined by the unfair practices statute. But the Seventh Circuit has interpreted this term in the context of the very similar Wisconsin Fair Dealership Law[1] and found that "a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination." *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 399 (7th Cir. 1992). Furthermore the Seventh Circuit also "suppose[s] that some combination of revenues and investments could manifest a community of interest, even

---

[1] Chapter 135 of the Wisconsin statutes, the Wisconsin Fair Dealership Law, is a remedial statute that seeks to shield dealers from unfair business practices by grantors. *See* Wis. Stat. § 135.025(2). Wisconsin Stat. § 135.04 of the WFDL imposes several requirements upon grantors attempting to terminate or substantially change the terms of a dealership.

A business relationship is a dealership within the meaning of the Wisconsin Fair Dealership Law (WFDL) if it satisfies the following elements: (1) a contract or agreement; (2) which grants the right to sell or distribute goods or services, or which grants the right to use a trade name, logo, advertising or other commercial symbol; and (3) a *community of interest* in the business of offering, selling or distributing goods or services. *Moe v. Benelli U.S.A. Corp.*, 743 N.W.2d 691, 306 Wis.2d 812 (Wisc. App. 2007).

if neither could standing alone."  *Id.*

In its briefing, Ervin asserts that it "sells only Wabash brand new dry vans and refrigerated vans, representing 40% of its total revenue and the majority of its new product sales."  [DE 30 at 1, 9.]  In addition, Ervin says that it "made the sort of investments that demonstrate a community of interest, including in land, advertising, trade shows, use of the Wabash trade mark, logos and brochures, and that its employees participated in numerous Wabash dealer meetings and sales trainings."  [DE 30 at 9.]  This appears to be a sufficient to establish a community of interest — at least when considering the issue on a motion to dismiss.  *See e.g.Frieburg Farm Equip., Inc.*, 978 F.2d at 400 ("Even a proportion as low as 11% [of revenue] can suffice if a relationship exhibits, as here, other characteristics of a community of interest.").  Of course, discovery will reveal whether there is in fact a "community of interest" as required by the statute.

So putting these puzzle pieces together, because Ervin is a dealer, who was granted by Wabash the right to use the names and marks Wabash® and Wabash National®, and all associated logos in promoting Wabash National products, DE 1-1 at ¶6, and there is a community of interest in the marketing of Wabash semitrailers, the Dealership Agreement granted Ervin a franchise and Ervin is a franchisee under Ind. Code § 9-32-13-27.[2]

---

[2] Given this holding, I need not determine whether the Dealership Agreement also amounts to a "selling agreement" under the statute (although I suspect it that likely does).

Finally, we arrive at the meat of the issue — whether Ind. Code § 9-32-13-27 requires *both* good cause and notice to a franchisee for termination of a franchise. I find, based on a plain reading of the statute, that it does. The statute enumerates two alternative ways a manufacturer commits an unfair practice, termination "without good cause *or* notice to the franchisee." Ind. Code § 9-32-13-27 (emphasis added). This is made clear by the preface which states, "It is an unfair practice for a manufacturer or distributor to do the following . . ." prior to the statute listing termination "without good cause or notice." In other words, it is an unfair practice to *either* terminate a franchise without good cause *or* terminate a franchise without notice.

This interpretation also is consistent with the intent of the statute. The Court of Appeals of Indiana has noted of the unfair practices statutes that "these are remedial statutes enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." *Andy Mohr W., Inc. v. Office of Indiana Sec'y of State*, 41 N.E.3d 704, 709 (Ind. Ct. App. 2015), transfer granted, opinion vacated sub nom. *W. v. IN. Sec'y of State*, 43 N.E.3d 243 (Ind. 2015). These types of statutes are intended to prevent manufacturers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand. This intent comports with the requirement that mere 90-day notice is not enough — a manufacturer must have good cause to terminate this type of agreement because such a termination may very well threaten the livelihood of

the franchisee.

Ervin alleges that Wabash did not have good cause to terminate or fail to renew the Dealership Agreement. [DE 16 at¶41.] Whether or not it did is a question of fact to be decided by the jury and cannot be decided at this early juncture. Ervin also raises an issue with the sufficiency of the notice provided under the Indiana unfair practices statute, which requires that "[n]otice provided under this subsection must include a detailed statement setting forth the specific grounds for the proposed action." Ind. Code § 9-32-13-27(a). Ervin alleges that the July 1, 2015 letter sent by Todd Chrzan does not meet these requirements. [DE 16 at ¶44.] The letter states that it follows up a recent call from Chrzan to Greg Ervin regarding coverage of Ervin's territory as a Wabash dealer and timeliness of paying invoices but provides no additional information regarding the content of the conversation and grounds for termination. It is plausible that this information was insufficient to put Ervin on notice of the grounds of the termination of the Dealership Agreement, but that is a question of fact to be addressed by the jury after details of the referenced conversation have been fleshed out. In sum, Ervin has sufficiently alleged facts, when accepted as true, to state a claim to relief under the Indiana unfair practices statute that is plausible on its face.

Count II of the amended complaint alleges that Wabash violated the Indiana Franchise Act, which makes it unlawful, among other things, for any franchise agreement to contain a provision that allows for the termination of the franchise without good cause. Ind. Code § 23-2-2.7-1(7) and (8). Ervin alleges that the

13

termination provisions of the Dealership Agreement were unlawful to the extent that they allowed Wabash to terminate the Agreement without good cause and that termination based on those provisions, therefore, is unlawful.  [DE 16 at ¶¶ 55–56.]  But as shown below, because Ervin was not given a "franchise" as defined by the Franchise Act, any claim under that Act must be dismissed.

Ind. Code § 23-2-2.5-1 states in relevant part:

(a) "Franchise" means a contract by which:

(1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3) the person granted the right to engage in this business is required to pay a franchise fee.

The agreement in this case fails to meet the first requirement of a franchise.  The Dealership Agreement does not contain mention of, nor does Ervin allege, the existence of a "marketing plan or system prescribed in substantial part by [Wabash]."  In fact, the Agreement very much states the opposite.  Paragraph 3 of the Agreement regarding the legal relationship between Ervin and Wabash states that "the Dealer controls its business and decision making to include its pricing and marketing."  [DE 1-1- at ¶4.] For this reason, Ervin has not sufficiently alleged a claim under the Indiana Franchise Act and Wabash's motion to dismiss this claim is granted.

14

Count III of the amended complaint alleges a breach of contract that is dependent on Ervin's claim under the Indiana Franchise Act and, therefore, must also be dismissed. Ervin alleges that because the provisions in the Dealership Agreement that allow Wabash to terminate or not renew the Agreement without good cause violate the Indiana Franchise Act, they are unlawful and unenforceable. [DE 16 at ¶¶ 61, 63.] But to repeat, the Dealership Agreement did not create a "franchise" under the Indiana Franchise Act. So any claim that is dependent on a violation of the Indiana Franchise Act must be dismissed.

To sum up: what this case will come down to is whether or not Wabash had good cause to terminate the Dealership Agreement for at least one of the reasons detailed in the termination letter – Ervin selling outside its AOR and/or its failure to timely pay its invoices. A subsidiary issue will be whether the termination letter provided sufficient notice of those reasons. The Dealership Agreement is ambiguous as to whether Ervin was prohibited from selling outside its AOR. And at this stage, there is little evidence regarding the parties' billing and payment practices. Discovery is necessary to clear up the contractual ambiguities and to discern the intent of the parties when the agreement was entered into, as well as to establish a factual record regarding the parties' billing and payment practices.

**Motion for Preliminary Injunction**

Ervin also moved for a preliminary injunction enjoining Wabash to continue the Dealership Agreement in full force and operation pending a final determination of this

matter. [DE 18 at 1.] "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a party must prove three elements: (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) that an irreparable harm will result if the injunction is not granted. *Id.* at 20; *see also Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). In this first phase of the analysis, the court needs to decide only whether the plaintiff has any likelihood of success — in other words, more than a negligible chance of prevailing. *Am General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).

"If the moving party meets the first three requirements, then the district court balances the relative harms that could be caused to either party." *Lambert*, 498 F.3d at 451; *see also Winter*, 555 U.S. at 24. So even if a suit looks like it has some merit, an injunction should not be issued if the harm to the defendant substantially outweighs the harm to the plaintiff without the injunction. *MacDonald v. Chi. Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997); *Roland Mach. Co. v. Dresser Indus. Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). The evaluation of a whether an injunction is appropriate is essentially made on a sliding scale. So when the balance of harms tips strongly in the defendant's favor, a more convincing showing of likely success on the merits is required by the plaintiff. *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 795 (7th Cir. 2013); *MacDonald*, 132 F.3d at 357.

Ervin has more than a "negligible" chance of winning, but on balance I think it has the worse side of the argument at this point. As I noted above, the agreement in this case has an ambiguity — or at least is silent — on the critical issue of whether Ervin was permitted to sell outside its AOR. It seems to me that at least implicit in the Dealership Agreement is the idea that Ervin was only permitted to operate within the AOR granted to it. Indeed, the Agreement is very specific in what Wabash was granting to Ervin. The Agreement says that Ervin is "appointed a Wabash National dealer of specified Wabash National products in the *area or areas of responsibility* listed on the Dealer Products and Area or Responsibility (AOR) Assignment that is <u>Exhibit B</u>." [DE 1-1 at 1 (italics added, underline in the original).] Ervin was granted nothing more and nothing less. What would be the point of an assignment of a specific AOR unless it limited the dealer to that area? Perhaps discovery will reveal that my sense of this agreement is incorrect. Perhaps parole evidence will show that the parties intended to allow Ervin to sell anywhere it wanted. Perhaps the parties course of conduct will show the same thing. But at this time, based on an incomplete and skeletal factual record, although Ervin's chances of prevailing are more than negligible, I don't think, based on my reading of the contract, that they are likely to win.

Similarly, the record is virtually devoid of facts regarding the billing and payment practices of Ervin and Wabash. While the termination letter indicates that there may have been an issue regarding Ervin's "timeliness of paying invoices," no evidence has been provided to further flesh out this issue. At this time, there simply is

not enough information for me to determine whether not Wabash had good cause to terminate the Dealership Agreement due to Ervin's payment practices and, therefore, determine that Ervin is likely to win.

What is more, even if my initial sense on this case is wrong and Ervin ultimately prevails, I am convinced that Ervin has an adequate remedy at law in the form of money damages. An inadequate remedy does not mean "wholly ineffectual," but rather "seriously deficient as a remedy for the harm suffered." *Rolan Machinery v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir. 1984). This is a breach of contract case. Any lost profit or other consequential damages that flowed from Wabash's alleged breach can be computed and Ervin eventually can be made whole if it prevails in the case.

In that same vein, there is another problem with Ervin's request for a preliminary injunction — it has failed to show that any harm to it is irreparable. Ervin needs to show irreparable harm is *likely* to occur in the absence of an injunction. *See Winter*, 555 U.S. at 22. The mere risk of irreparable harm is not sufficient. *Id.*; *Eaton Corp. v. Appliance Valves Corp.*, 526 F. Supp. 1172, 1181 (N.D. Ind. 1981). Ervin cites to several Seventh Circuit cases delineating types of harm that is considered irreparable including the threat of insolvency, loss of employees, revenue, business locations, and goodwill. [DE 18 at 21-22.] Yet Ervin does nothing to explain *how* these harms will come to pass. All Ervin has done is state in a conclusory way that it "will lose its entire business focused on the sale of new dry vans and refrigerated semitrailers [and that] [t]he loss of

this roughly 40% of Ervin's revenue will undermine the rest of Ervin's business, particularly if Ervin cannot reduce or remove those fixed expenses it incurred to facilitate its performance under the Dealership Agreement." [*Id.* at 22.] What Ervin does *not* explain is why, when it received notice of the termination of the Dealership Agreement on July 1, 2015, it did not or could not begin pursuing dealership arrangements with competitors of Wabash, as it was no longer bound by the non-compete provision in the Dealership Agreement, or why it could not do so in the future. Ervin evidently successfully made the transition in 2011 from another manufacturer to Wabash. Ervin does not explain why its current facilities, employees, and other "fixed expenses" could not be used to sell competing products or even allow for expansion into other revenue-generating product areas. In fact, Ervin presents no evidence that: (1) it did anything to attempt to mitigate the alleged potential "irreparable harm" prior to filing this action four months after it received the notice of termination of the Dealership Agreement from Wabash, a little over a month before the Dealership Agreement was set to terminate, or why it was unable to; (2) it did anything to attempt to mitigate the alleged potential "irreparable harm" once it determined that it had to resort to litigation, or why it was unable to; or (3) it is unable to mitigate the potential "irreparable harm" in the future.

While I understand that Ervin might have hoped to resolve the issue without resorting to litigation, it did so at its own peril. And the fact that Ervin did nothing to pursue other revenue sources during that period of time certainly doesn't counsel in its

favor on the issue of irreparable harm, especially given its lack of explanation as to why it *could not* find other sources of revenue to prevent the irreparable harm that it is only generally asserting. While I have no doubt that the termination of the Dealership Agreement with Wabash is a blow to Ervin's business, Ervin simply has not presented me with enough facts to show that irreparable harm is *likely* to occur in the absence of an injunction. *See Winter*, 555 U.S. at 22.

Finally, the balance of harms favors Wabash. To grant Ervin a preliminary injunction in this case is essentially to grant it a nationwide dealership. This strikes me as an "extraordinary" thing to do. *Winter*, 555 U.S. at 24. It would be tantamount to a complete rewriting of the parties' agreement. According to Wabash, they have 22 other dealers around the country. To grant Ervin a nationwide dealership could severely undermine the agreements Wabash has with those other dealers. Ervin says in its reply brief that selling outside ones AOR is a commonplace occurrence in the Wabash dealership network, but the evidence on this point is scant at best. [DE 30 at 14.] Furthermore, granting the preliminary injunction would force Wabash to continue to work with a dealer with which Wabash no longer wants to engage in business because Wabash believes the dealer is acting in a way that is against Wabash's best interest and is in violation of the Dealership Agreement. *See, e.g., Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992) (noting the "real though unquantified harm to [the franchisor] of being forced to continue doing business with a franchisee who not only committed rampant violations of the franchise

agreement but also infringed the franchisor's trademarks").

For all these reason, Ervin's motion for preliminary injunction is denied.

## CONCLUSION

For the aforementioned reasons, the Court:

- **DENIES** Wabash's Motion to Dismiss Amended Complaint [DE 20] as to Count I of the amended complaint;

- **GRANTS** Wabash's Motion to Dismiss Amended Complaint [DE 20] as to Count II and Count III of the amended complaint; and

- **DENIES** Ervin's Motion for Preliminary Injunction [DE 17].

**SO ORDERED**.

ENTERED: May 17, 2015.

 s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT